## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **NANCY F. LANGWORTHY,**  )<br>  **3950 Langley Court,**  )<br>  **Washington, D.C. 20016,**  )<br>  )<br>   **Plaintiff,**  )<br>  )<br>       **v.**  )<br>  )<br> **JEFFERSON B. SESSIONS,**  )<br>  **Attorney General of the United States,**  )<br>  **U.S. Department of Justice,**  )<br>  **Washington, D.C. 20530,**  )<br>  )<br>   **Defendant.**  )<br> ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ ) | **Civ. Action No.** |

## COMPLAINT AND DEMAND FOR JURY TRIAL

### Preliminary Statement

1.)     This is an action by Nancy F. Langworthy, Esq., an accomplished GS-15 Trial Attorney in the Housing and Civil Enforcement Section ("HCE") of the Civil Rights Division ("CRT") of the U.S. Department of Justice ("DOJ").   As of the date of this Complaint, Ms. Langworthy has held this position for more than 17 years and, but for the actions that comprise the subject matter of this Complaint, the records of her performance and her conduct have been exemplary.   She has received several awards in recognition of her accomplishments throughout her career with HCE.

2.)     In 2009, Ms. Langworthy was diagnosed with chronic Lyme Disease (Lyme Borreliosis Complex) and co-infections.   Lyme Borreliosis Complex, which is transmitted by the bite of a deer tick, is a multisystemic, autoimmune disease in which the central nervous system is substantially impacted.   In Ms. Langworthy's case, the disease caused, or contributed to, brain lesions; neurofibromas (nerve tumors); radiating nerve pain; fine motor skill impairment; joint

pain; severe digestive tract dysfunction; urticaria and angioedema, which entail raised hives or welts on the skin, swelling of the face and joints, and breathing difficulties; profound fatigue; impaired balance; disturbed sleep; and liver and spleen infection and enlargement.  Ms. Langworthy suffers the effects of each of these debilitating conditions, among others, as a result of Lyme Disease, as well as Bartonella and Babesia co-infections.  In addition, she has been diagnosed with degenerative disc disease of the lumbar spine.

3.)   Ms. Langworthy's Lyme disease substantially limits multiple major life activities, and management of stress is imperative in controlling its debilitating symptoms.  Ms. Langworthy's impairment has been repeatedly diagnosed and confirmed by medical examinations and tests.  The batteries of treatments and tests that her illness routinely requires can be very harsh, to the point of being debilitating on their own.

4.)   Ms. Langworthy is and at all times relevant has been a qualified individual with a disability, as that term and its component terms are used and defined under the Americans With Disabilities Act ("ADA"), 42 U.S.C. §12112, et seq., as amended by the ADA Amendments Act of 2008 ("ADAAA"), Public Law No. 110-325, and regulations of the Equal Employment Opportunity Commission ("EEOC"), 29 C.F.R. §§1630.2(g)-(m).[1]  The ADA entitles disabled individuals like Ms. Langworthy to reasonable accommodation in their employment, requires their employers to engage in an interactive process in good faith and in a timely manner when employees request Reasonable Accommodation ("RA") for their disabilities, and protects qualified

---

[1]   The Rehabilitation Act of 1973, as amended, 29 U.S.C. §§791 et seq., is the analog to the ADA for federal employees like Ms. Langworthy.  29 U.S.C. §794(a).  The Rehabilitation Act specifies that, in all respects relevant to this case, the standards of the ADA "shall" be used to determine if the Rehabilitation Act "has been violated."  29 U.S.C. §794(d).  Consequently, this Complaint refers to Ms. Langworthy's substantive rights by reference to the ADA, 42 U.S.C. §§12101 et seq., as amended by the ADAAA.

individuals with disabilities from discrimination and retaliation for exercising their rights under the ADA, as amended.  42 U.S.C §§12112(a), (b)(5)(A); 42 U.S.C. §12203(a); 29 C.F.R. §§1630.2(o).

5.)    Defendant's violations of the ADA began in October of 2015, and were followed with a series of actions toward Ms. Langworthy from that point forward.  These violations included defendant's denial of Ms. Langworthy's RA request for reasonable accommodation taking the form of permanent reassignment to an attorney position within the Department of Justice with fewer court-imposed deadlines, more consistent and manageable hours, fewer physical requirements, and adequate support staff in place; its failure to offer Ms. Langworthy effective interim accommodations during the RA process; its failure to engage in the interactive RA process effectively, in good faith, and in a timely manner; and its failure to offer Ms. Langworthy effective alternative accommodations  It also concerns a punitive written Reprimand and Performance Improvement Plan ("PIP") defendant issued to Ms. Langworthy after Ms. Langworthy formally sought a permanent RA, and their use as a pretext to revoke Ms. Langworthy's use of telework and an alternative work schedule ("AWS"), partial accommodations she had enjoyed for several years, and defendant's unreasonable delay in reinstating them.  Each of defendant's violations of the ADA exacerbated the symptoms of Ms. Langworthy's Lyme Disease, caused her substantial physical pain, severely affected her health, and deeply affected her emotional well-being.

6.)    This case arises under the ADA as amended, 42 U.S.C. §§12101 et seq., and seeks: a.) a declaration that defendant unlawfully violated Plaintiff's rights under the ADA and the ADAAA; b.) an order reassigning Plaintiff to a different position as an attorney in the Department of Justice with fewer court-imposed deadlines, more consistent and manageable hours, and available telework; c.) removal of the Performance Improvement Plan and Reprimand improperly

issued to Plaintiff on November 4, 2015, from her official personnel files, prevention of their use as a historic record for progressive discipline, and other suitable equitable relief; d.) compensatory damages in the maximum amount permitted by law; and e.) an award of Plaintiff's attorneys' fees and costs.[2]

## Parties, Jurisdiction, and Venue

7.)     Plaintiff Nancy F. Langworthy is and was at all times relevant to this Complaint employed as a GS-15 Trial Attorney by the Housing and Civil Enforcement Section within the United States Department of Justice's Civil Rights Division.  Ms. Langworthy suffers from Lyme Borreliosis Complex, a disability that substantially limits one or more of her major life activities.

8.)     Defendant Jefferson B. Sessions is the Attorney General of the United States and as such is the official who heads the United States Department of Justice.  The Housing and Civil Enforcement Section within DOJ's Civil Rights Division employs Plaintiff and engaged in the violations of the ADA and the ADAAA that are the subjects of this action.  Defendant is sued in his official capacity only.

9.)     Jurisdiction of this court is based upon 28 U.S.C. § 1332; 42 U.S.C. §12117(a); and 29 U.S.C. §794(a).  Venue lies in this judicial district pursuant to 42 U.S.C. § 12117(a); 28 U.S.C. §1404; and 29 U.S.C. §794(a) because defendant's acts occurred in this judicial district, where Plaintiff is employed.

---

[2]     The remedies available to a prevailing Plaintiff under the ADA and the Rehabilitation Act are the same as those available under Title VII of the Civil Rights Act, 42 U.S.C. §2000e-16 (incorporating 42 U.S.C. §2000e-5).  42 U.S.C. §1981a(2).

**Statement of the Case**

**Background**

10.)     Plaintiff Nancy F. Langworthy has been employed as a Trial Attorney for the Housing and Civil Enforcement Section ("HCE") within the Department of Justice's Civil Rights Division since 2000.  Until the actions that gave rise to this Complaint, she consistently received ratings at the "Excellent" level or above, both overall and in each individual category.

11.)     Ms. Langworthy came to the Department of Justice in 2000 as an accomplished trial attorney.  She served in supervisory attorney positions in each of her two previous places of employment with the Washington Metropolitan Area Transit Authority ("WMATA") and the District of Columbia Office of the Corporation Counsel.

12.)     HCE is a litigation section within CRT whose mission is to enforce fundamental civil rights legislation under the Fair Housing Act, the Equal Credit Opportunity Act, Title II of the Civil Rights Act of 1964, the Religious Land Use and Institutionalized Persons Act, and the Servicemembers Civil Relief Act.  As a trial attorney for HCE, Ms. Langworthy is responsible for investigating and litigating all aspects of cases arising under these statutes, including conducting depositions, preparing and responding to written discovery requests, interviewing witnesses, drafting motions and briefs, trying cases, and meeting stringent court deadlines.  HCE attorneys manage caseloads under tight court-imposed deadlines which at times call for work in excess of fifty to sixty hours per week on an irregular and unpredictable schedule.

13.)     In 2009, after nine years of excellent performance in HCE, Ms. Langworthy was diagnosed with chronic Lyme Borreliosis Complex, an auto-immune disease that substantially limits one or more of her major life activities.  Her disease significantly impacts her central nervous, musculoskeletal and digestive systems, and among other symptoms and effects, has

caused impairment of her motor skills, brain lesions, sleep disturbances, severe pain, chronic and severe digestive tract problems, profound fatigue, and nausea.

14.) Ms. Langworthy is a qualified individual with a disability because she can perform the essential functions of her position with or without a reasonable accommodation. 42 U.S.C. § 12111(8); 29 C.F.R. §§1630.2(m).

15.) Ms. Langworthy first made her disability known to HCE management soon after her diagnosis in 2009 by notifying former Section Chief Steven Rosenbaum, Deputy Section Chief Michael Maurer, and former Deputy Section Chief Rebecca Bond of her diagnosis and its effects. Sometime shortly thereafter, she also informed Deputy Chiefs Tamar Hagler, Timothy Moran, and Jon Seward of her disability. In 2010, Ms. Langworthy confided in Sameena Majeed, who was then a colleague of Ms. Langworthy and would later become Principal Deputy Chief, then Chief, of HCE, that she suffered chronically from Lyme disease and described the physical challenges of the disease and the medical protocols placed on her.

16.) Despite her disability and at great personal cost, prior to 2015, Ms. Langworthy was able to manage her illness and the demands of her job through a combination of teleworking one day every two weeks and working an Alternative Work Schedule ("AWS"), which enabled her to work longer hours in order to have one extra day off each two-week pay period. This allowed her to manage her disability by scheduling doctor's visits and treatments around days that she was not in the office. It also allowed her to manage her disability by saving her the additional time and energy that it would take her to get ready for work and commute to the office. Ms. Langworthy had informed HCE management that she was better able to manage her disability and treatment through using telework and AWS as justification for her request to avail herself of them.

Both telework and AWS were available to all HCE attorneys, regardless of disability, whose performance remained at the "Excellent" level or above.

17.)    On August 26, 2011, after her managers were already aware of her disability and its effects, Ms. Langworthy provided HCE management with medical documentation from her treating physician, Samuel Shor, M.D., demonstrating that she suffered from chronic Lyme disease and that her condition was disabling.  She did so to support a request to telework part-time for one month while she underwent a particularly harsh medical protocol to manage her Lyme disease. Her request detailed the symptoms of her chronic Lyme Disease, including profound fatigue, chronic pain of the muscles, joints, and nerves, and at times, cognitive dysfunction, and advised that the medical treatment that she was about to undergo could by itself cause severe "Herxheimer" reactions, including acute worsening of her joint pain, fever, lymph node swelling, and fatigue. HCE Section Chief Rosenbaum, who had informed Ms. Langworthy that she needed to provide medical justification for her leave request, approved her request after reviewing Dr. Shor's letter. In July of 2015, Ms. Langworthy subsequently reminded Ms. Majeed and other HCE managers of her Lyme illness, and the fact that she was again undergoing a particularly harsh treatment regimen.

18.)    In July of 2015, there was a push by then-Chief of HCE, Steven Rosenbaum, to have the hallways of HCE cleared after staff attorneys had long made it a practice of storing their overflowing case files in filing cabinets in the hallways.  Administrative support staff was assigned to facilitate the process.  In mid-July 2015, in an early phase of the process, active case files of Ms. Langworthy's were inadvertently replaced with the files of a since-departed attorney that had been assigned to paralegals and attorneys other than Ms. Langworthy.  As a result, Ms. Langworthy reached out to HCE's management, and subsequently, at management's direction, HCE support

personnel, to determine to whom the files belonged.  Ms. Langworthy also sought assistance in removing and directing the misplaced files.

19.)     On July 15, 2015, Ms. Langworthy was forced to review, sort, load into boxes, and label the misdirected files on her own.  That same day, after she had begun but before she had completed her review of the substituted files in the cabinet, she was called into a meeting with Deputy Chiefs Majeed, Maurer, and Hagler about her handling of an incident with a member of HCE's support staff regarding her requests for assistance in organizing and moving some of the misplaced files.  Ms. Langworthy informed the managers that she and the staff member had both apologized to each other over what she considered a minor incident and that they had ended the conversation on an amicable note.  She also told them that she had informed her colleague, as she had informed HCE management, that moving boxes was difficult for her because of her health challenges.  During this meeting, Ms. Langworthy also informed the managers that the day before, she and her siblings had been told for the first time that her mother was dying.

20.)     On July 18, 2015, after Ms. Langworthy's managers tried to set up a follow-up meeting about the case file incident on her scheduled telework day, Ms. Langworthy advised Ms. Majeed, Mr. Rosenbaum, and other managers in an email that she was undergoing an especially harsh medical treatment protocol and reminded them that she had applied for telework in order to reduce the physical stress posed by her Lyme disease.

21.)     The results of defendant's demands on Ms. Langworthy due to her disability were predictable.  The review, sorting and removal from her filing cabinet of hundreds of pages of files in matters assigned to others, which required lifting, bending and squatting, exacerbated her symptoms of Lyme disease and disc degeneration, and the pain and discomfort under which Ms. Langworthy labors as a matter of routine were increased.  Shortly thereafter, Ms. Langworthy

began to discuss with her treating physician the advisability of seeking a transfer from HCE to better manage the challenges of her disabilities.

## Ms. Langworthy's Initiation of the Interactive RA Process and Defendant's Immediate Retaliation

22.) In early October of 2015, after successfully managing her disabilities and heavy workload in HCE for more than six years following her diagnosis, Ms. Langworthy contacted Derek Orr, CRT's designated Disability Program Manager, to begin the interactive Reasonable Accommodation ("RA") process. Ms. Langworthy left Mr. Orr a voicemail to initiate an RA request.

23.) Ms. Langworthy subsequently notified HCE Deputy Chief Maurer directly that she had initiated the RA request process with her physician and the RA director and that she was seeking an RA in the form of a transfer.

24.) On October 14, 2015, more than a week after Ms. Langworthy reached out to him, Mr. Orr responded to her inquiry, and the two began communicating via email regarding the steps for submitting an RA request.

25.) On October 30, 2015, Ms. Langworthy informed HCE Deputy Chief Seward of her plans to formally request an RA in the form of a transfer to another section and Mr. Seward told her that he intended to go immediately to then-Section Chief Steven Rosenbaum to communicate the request. According to a written statement by Mr. Seward, he did so that afternoon.

26.) That same day, Ms. Langworthy finalized and submitted her formal RA request. Specifically, she requested a Reasonable Accommodation in the form of a reassignment as an attorney to another section within CRT that would have fewer court-imposed deadlines, more manageable hours, fewer physical requirements, and adequate support staff in place. At no time during the interactive RA process did defendant advise Ms. Langworthy that there was not an

available position in CRT or elsewhere in the Department of Justice fitting this description. Neither did defendant advise Ms. Langworthy that finding such a position would impose an undue hardship upon it.

27.)    Under both DOJ and CRT policy, the deciding official in an RA request is required to issue a written decision to the employee making the request within fifteen business days of receiving a completed request.  As is detailed below, defendant failed to abide by these policies, both upon Ms. Langworthy's submission of her formal request in October of 2015, and again after she submitted a supplemental, second request in February of 2016.  Defendant's failure caused Ms. Langworthy to suffer physically and emotionally and exacerbated the effects of her disability.

28.)    Ms. Langworthy's RA request was accompanied by a medical report from the physician who had been managing her disability, Joseph Jemsek, M.D., who is Board Certified in Internal Medicine, Infectious Disease.  Dr. Jemsek's report was highly detailed and described, among other matters, Ms. Langworthy's disability, its etiology, its effect on her, and its chronicity. It specifically referred to the marked fatigue, joint and muscle pain, neurological dysfunction, and digestive tract challenges caused by Lyme disease.

29.)    Dr. Jemsek's report also described Ms. Langworthy's treatment program and its potential to exacerbate her symptoms on its own.  In addition, he specified that physical, psychological, and/or environmental stressors could aggravate or exacerbate the symptoms of Ms. Langworthy's condition by placing increased stress on an already fragile system, and stated that avoiding extraneous stressors was integral to Ms. Langworthy's healing process.

30.)    Dr. Jemsek's report specifically supported Ms. Langworthy's request for an RA in the form of a reassignment as an attorney to a section in CRT with fewer court-imposed deadlines

and stated that such a reassignment would be "highly medically beneficial" for Ms. Langworthy. Dr. Jemsek also stated that Ms. Langworthy would benefit from the ability to telework.

31.)     On November 4, 2015, less than a month after Ms. Langworthy first contacted Mr. Orr and Deputy Chief Maurer about initiating the RA process, and just three business days after speaking with Deputy Chief Seward about the matter and submitting her formal RA request, Ms. Langworthy was issued an Official Reprimand by Ms. Majeed and Mr. Maurer for allegedly unprofessional conduct toward co-workers and support staff.  With one partial exception, defendant never gave Ms. Langworthy notice of the allegations or an opportunity to present an account of her own before issuing the Reprimand, and failed to take account of the effects of Ms. Langworthy's disability either in originally issuing the Reprimand or afterward.

32.)     The vast majority of the allegations contained in the Reprimand were substantially if not entirely false, and others were vague and unattributed.  Many involved innocuous communications between Ms. Langworthy and support staff that were necessary to meeting court and other deadlines and defendant's account of these interactions was directly contradicted by contemporaneous e-mails.  Further, and by way of example only, the Reprimand included an allegation that Ms. Langworthy had refused to provide her office's paralegal supervisor case information needed to index and store files that had been mistakenly moved to Ms. Langworthy's filing cabinet.  Not only had Ms. Langworthy reviewed, sorted files page-by-page, boxed, and labeled files, on July 15, 2015, she had sent an e-mail to paralegal, clerical, and her own supervisors, including Ms. Majeed and Mr. Maurer, specifically identifying previously misplaced files and informing them of their precise locations.

33.)     The same day the Reprimand was issued, November 4, 2015, Ms. Majeed also issued Ms. Langworthy a Performance Improvement Plan ("PIP"), the first step in terminating a

career federal employee for cause on performance grounds, stating that her performance in the Critical Element of Professionalism, Teamwork, and Productivity had fallen to the unacceptable level for the first time in her then 15-year career with HCE.  The PIP was based on the contemporaneous Reprimand Ms. Majeed issued to Ms. Langworthy and, by definition, was equally also baseless.  In addition to the examples noted above, the PIP relied upon the baseless allegation that Ms. Langworthy had interfered with an important team meeting by creating an unnecessary scheduling conflict with a paralegal whose attendance was needed at the meeting.  In fact, Ms. Langworthy was unaware of the paralegal's other assignments and had asked the paralegal to meet with her the day before or another mutually convenient time.

34.)     Prior to the Reprimand and the PIP, Ms. Langworthy had consistently received an overall rating of "Excellent" or above during her 15-year tenure with the section.  She had also consistently received a rating of "Excellent" or "Outstanding" in each category of her evaluation, including Professionalism, Teamwork and Productivity.

35.)     The Reprimand, and thus the PIP, which explicitly adopted the Reprimand, itself acknowledged the role of Ms. Langworthy's disability and family medical issues on her allegedly unprofessional behavior.  Nonetheless, the PIP removed Ms. Langworthy from HCE's teleworking program and from her Alternate Work Schedule, both of which Ms. Langworthy had depended upon for several years to manage her disability.  AWS and teleworking are available as a matter of course to HCE attorneys performing at the Excellent level or above, whether or not they are disabled.  These actions were taken based on policies that applied to attorneys who were not disabled and without regard to the fact that Ms. Langworthy needed AWS and teleworking to manage her Lyme disease and treatment of it.

36.)     On November 6, 2015, then-Section Chief Steven Rosenbaum approved the removal of Ms. Langworthy's AWS and telework, again without considering that Ms. Langworthy needed AWS and teleworking to manage her Lyme disease and treatment.

37.)     That same day, Mr. Orr informed Ms. Langworthy that he had reviewed her RA request and confirmed that she had provided all "relevant" information.  He further indicated that the decision to approve her accommodation would be made by Section Chief Rosenbaum.   In response, Ms. Langworthy contacted Mr. Rosenbaum to set up a time to hand-deliver her RA request to him.  In accordance with their arrangement, Ms. Langworthy delivered the RA to Mr. Rosenbaum on November 9, 2015.

38.)     On November 19, 2015, after consulting with an attorney assigned to handle EEO matters for the Division, who was also advising the Division on Ms. Langworthy's Reprimand and Grievance, Mr. Orr reached out to Ms. Langworthy, posing a number of questions about her request and for the first time asking that she provide documentation that her request for a reassignment was "medically necessary."   The ADA does not condition the approval of RA requests on the requested accommodation being medically necessary.  Moreover, Dr. Jemsek had stated in his letter of October 22, 2015, which was included in Ms. Langworthy's October 30, 2015 RA request, that an accommodation in the form of a transfer would be "highly medically beneficial."

39.)     Several days later, Mr. Orr provided Ms. Langworthy with an arbitrary deadline of December 18, 2015 to supplement her RA request and demonstrate that reassignment was a medical necessity.  He also informed her that if she did not meet it, her request would be closed out and she would have to start the RA process over again.

40.)     On November 23, 2015, Ms. Langworthy responded to Mr. Orr by providing additional and specific factual information about why she needed to be reassigned out of HCE.

41.)     On November 30, 2015, Ms. Langworthy submitted a Memorandum entitled "Supplement to Accommodation Request and Grievance of Official Reprimand" to Chief Rosenbaum, detailing the symptoms of her illness, the particular challenges her current treatment of it posed, and the effects that the recent in the office had on her condition.  She also responded to each of the allegations against her in the Reprimand, attaching communications in the form of contemporaneous emails that were the subject of or related to the allegations and which directly contradicted allegations in the Reprimand, and expressed her belief that the Reprimand and PIP were issued in retaliation for her RA request.

42.)     On December 3, 2015, Ms. Langworthy made initial contact with an EEO counselor over defendant's failure to grant her RA request and the issuance of the PIP and Formal Reprimand.  She informed Mr. Orr the next day of this protected EEO activity.

43.)     On December 14, 2015, Chief Rosenbaum issued a three-paragraph conclusory decision on Ms. Langworthy's grievance, upholding her Reprimand without addressing any of the evidence she presented.  The decision also failed to restore Ms. Langworthy's AWS or telework.

44.)     That same day, Ms. Langworthy also notified Mr. Orr that due to Dr. Jemsek's demanding schedule, she had not yet been able to obtain a revised report from him and might not be able to meet the established deadline of December 18, 2015, to supplement her RA request.

45.)     On December 18, 2015, the date of defendant's arbitrary deadline, Ms. Langworthy informed Mr. Orr that she would not be able to supplement her RA request that day due to her physician's inability to prepare a revised report by that date.  Her RA request was nonetheless closed out that day.

**Effect of Defendant's Failure to Accommodate on Ms. Langworthy's Health**

46.)     At no point between Ms. Langworthy's initial contact with the RA office in October of 2015, and February 24, 2016, when she renewed her RA request, did defendant grant Ms. Langworthy's requested accommodations, offer alternative accommodations, engage in the interactive RA process, or restore her telework and AWS.

47.)     Defendant's failure to engage in the interactive process or offer Ms. Langworthy a reassignment or effective alternative accommodations exacerbated the symptoms of Ms. Langworthy's Lyme disease.  Specifically, her nerve pain substantially increased, particularly in her right leg and foot; her digestive tract symptoms significantly worsened, requiring her to adopt an even more restrictive diet and to curtail some activities; and she developed new auto-immune manifestations of her illness, chronic urticaria and angioedema, which were diagnosed by an immunologist in May of 2017 and entail hives, face, joint and capillary swelling, and throat closure.  These symptoms have not improved and must be controlled daily by four to five types of additional medications with debilitating side effects.  Defendant's failure to approve Ms. Langworthy's request for reassignment also delayed a more aggressive treatment deemed necessary by her physician to improve her health.

**Defendant's Continued Retaliation and Failure to Engage in Interactive RA Process**

48.)     On February 8, 2016, Ms. Majeed issued Ms. Langworthy a memorandum informing her that she had successfully completed her PIP, which, by its own terms, was to have concluded on December 18, 2015.  Ms. Langworthy was never given any indication that she had not fulfilled its terms by that date.  Despite the conclusion of the PIP, Ms. Langworthy's telework and AWS were not restored, supposedly because she was ineligible from those programs under

one of defendant's policies that applied to non-disabled attorneys whose performance had fallen to below the acceptable level in one or more critical performance elements for one year.

49.)    On February 24, 2016, having obtained a revised and more detailed report from Dr. Jemsek, Ms. Langworthy submitted a renewed RA request to Mr. Orr.  Reiterating the reasons that she provided in support of her original request, Ms. Langworthy again sought reassignment to a division with fewer court-imposed deadlines, more manageable hours, and adequate support staff.

50.)    Dr. Jemsek's revised report, which specifically addressed all of the questions that Mr. Orr posed in his November 19, 2015 email, again fully supported Ms. Langworthy's request for a transfer.  It also once again detailed her impairment and symptoms, as well as the significant and detrimental impact that extraneous stressors had on her condition, noting that it was integral to Ms. Langworthy's healing process to avoid such stressors.  This report expressed Dr. Jemsek's expert medical opinion that a reassignment to a section with fewer court deadlines, more regular and predictable hours, more available teamwork, and an environment in which supervisors understood and would assist in mitigating the deleterious effects of stress on Ms. Langworthy's condition was "medically necessary."  Dr. Jemsek also stated in his report that he had decided to delay a more aggressive treatment regimen that was necessary to Ms. Langworthy's recovery due to the high level of stress in her office environment.  As before, at no time during the interactive RA process did defendant advise Ms. Langworthy that such a position was unavailable or could not be made available.

51.)    Dr. Jemsek's revised report also reiterated that Ms. Langworthy would "benefit greatly" from having telework restored.

52.)    By March 16, 2016, and despite the 15-day deadline under both DOJ and CRT policies to act on an RA request, nearly five months had elapsed since Ms. Langworthy's original

RA request and defendant's issuance of the reprimand and PIP and withdrawal of her AWS and telework.  In the interim, defendant had not engaged in the interactive process, much less granted her requested RA or effective alternative accommodations.  As a result, having already initiated the informal EEO process in December as specified in paragraph 46, Ms. Langworthy filed a formal EEO complaint over defendant's continued failure to grant her RA request, its issuance of the PIP and Reprimand and its commensurate termination of her telework and AWS.

53.)  On May 25, 2016, almost seven months after her original formal RA request and three months after her second formal RA request, defendant first began to engage in the interactive RA process by scheduling a meeting between Ms. Langworthy, Mr. Orr, HCE Deputy Chief Tamar Hagler, and CRT acting Chief of Staff Kathy Toomey, whom Mr. Orr had first identified in November of 2015 as the deciding official regarding requests for transfer.  This is the first action defendant ever took to address the substance of Ms. Langworthy's RA request.

54.)  In an email dated May 16, 2016 inviting Ms. Langworthy to the meeting, Ms. Toomey stated that that the current medical documentation she had provided did not support her entitlement to a reassignment.  Ms. Langworthy was never informed in what way her medical documentation was insufficient, especially in light of the fact that Dr. Jemsek's revised report addressed all of Mr. Orr's original concerns and stated that a reassignment was medically necessary.  As before, at no time during this meeting did defendant advise Ms. Langworthy that a position in CRT fitting this description was not available, or advise Ms. Langworthy that finding such a position in CRT or the Department of Justice would impose an undue hardship.

55.)  During the May 25, 2016 meeting, Ms. Langworthy described her medical condition and its symptoms, the stressors present in HCE that exacerbated her condition, and the detrimental impact that the demands of HCE, in particular the long hours and short deadlines, had

on her health.  She also gave Ms. Toomey two scientific articles on Lyme disease provided by Dr. Jemsek's office as a supplement to his February 19, 2016, letter in support of her request for a reasonable accommodation.  She reiterated the importance of being reassigned to a section within CRT that had fewer court-imposed deadlines and required fewer hours.  She also discussed the benefits that telework would have on her health, and explained that defendant revoked the ability to telework.[3]

## Effects of Defendant's Continued Failure to Accommodate on Ms. Langworthy's Health

56.)    At no point between Ms. Langworthy's renewed RA request of February 24, 2016, and June 9, 2016, did defendant grant Ms. Langworthy's requested accommodations, offer effective alternative accommodations, or restore her telework and AWS.  In the meantime, Ms. Langworthy's health continued to deteriorate due to defendant's continued failure to accommodate her disability.  In 2017, Dr. Jemsek advised Ms. Langworthy that her health was still insufficiently stable for her to resume an aggressive treatment protocol, which was expected to improve her health in the long run.

## Defendant's Denial of Ms. Langworthy's RA Request

57.)    On June 10, 2016, acting Chief of Staff Toomey issued a decision denying Ms. Langworthy's RA request for reassignment on the supposed basis that her medical documentation did not support her request.  This was despite Dr. Jemsek's unequivocal statement in his report that reassignment to another division was "medically necessary."  At this time, defendant did not offer Ms. Langworthy any effective alternative accommodations, nor did it restore her telework.

---

[3]     During this meeting, Plaintiff informed Ms. Toomey that an AWS schedule would no longer be an effective accommodation, either by itself or in combination with other reasonable accommodations.

Ms. Langworthy was again not informed of any way in which her medical documentation was insufficient, or that a position fitting the description she had given defendant was not available.

58.) Ms. Langworthy submitted a request for reconsideration of defendant's denial of her RA request one week later on June 17, 2016. Defendant denied this request and then directed Ms. Langworthy's appeal of the denial to Deputy Assistant Attorney General Eve Hill for consideration on July 11, 2016. Ms. Hill was provided a copy of the Department of Labor's (DOL's) "accommodation ideas" for Lyme Disease, which was created in response to a Presidential initiative and includes "transfer to a less stressful position" and teleworking among its recommended accommodations for Lyme disease.

59.) Nonetheless, on July 19, 2016, Ms. Hill denied Ms. Langworthy's request for reconsideration, claiming that reassignment could only be considered when other accommodations were either unavailable or unsuccessful. At this juncture, as Ms. Hill had acknowledged, defendant still had not provided Ms. Langworthy any alternative accommodations whatsoever or restored her telework. Ms. Hill stated that she expected defendant to reach out to Ms. Langworthy regarding other available accommodations shortly

60.) On July 28, 2016, now nearly nine months after her original request, Ms. Langworthy met with Ms. Hagler to discuss "alternative" accommodations. In place of reassignment, defendant suggested reinstating Ms. Langworthy's telework; offering IT assistance to help enable to her to work from home; agreeing in the short-term to avoid giving Ms. Langworthy one type of assignment with particularly tight turn-around times, HUD "election referrals"; and offering Ms. Langworthy assistance in moving boxes in the future. At the time, Ms. Langworthy only had one HUD election referral case on her docket and they had typically been reserved for junior attorneys in CRT. This minimal offer of all-but ineffectual alternate

accommodations was put into writing on August 1, 2016, and Ms. Langworthy's telework was restored on August 22, 2016, after new paperwork was submitted and approved.

61.)    No prior actions were taken to restore Ms. Langworthy's telework, even though its revocation was based on a policy that was designed to apply to employees without disabilities.

**Impact of Defendant's Denial of Ms. Langworthy's Request for Reassignment**

62.)    Ms. Langworthy's health has continued to deteriorate and her symptoms have increased and become more severe as a result of defendant's treatment of her.  In particular, her digestive tract issues have worsened; her nerve pain has significantly increased, often keeping her awake at night; and her auto-immune symptoms have multiplied or worsened.   Without the additional medication she is currently on to control new manifestations of her illness triggered by stress – which themselves cause extreme fatigue – she would be suffering from hives all over her body, facial swelling, especially of the lips and nose, and partial throat closure.  The symptoms can break through the medication, causing great discomfort and requiring increased dosage and additional medications.

**Exhaustion of Administrative Remedies**

63.)    No later than December 3, 2015, Plaintiff timely initiated the administrative EEO informal complaint process.  On March 16, 2016, Plaintiff timely filed a formal administrative complaint alleging defendant discriminated against her based on her disability and retaliated against her for requesting a Reasonable Accommodation.   She subsequently amended her complaint on August 30, 2016, September 6, 2016, and September 10, 2016 to include additional facts in support of her claims of discrimination and retaliation over defendant's July 19, 2016 denial of her RA request.  The Report of Investigation ("ROI") into Plaintiff's administrative complaint was issued on February 2, 2017.  More than 180 days have elapsed since Plaintiff filed

her formal administrative complaint without the issuance of a Final Agency Decision.  With the foregoing actions and all others required of her by law, Plaintiff timely exhausted the administrative remedies available to her to challenge the actions that comprise the subject matter of this Complaint.

## COUNT I
### (Violations of the ADA:  October 2015 through February 23, 2016)

64.)     Plaintiff repeats the allegations contained in paragraphs 1 through 63 above, as though fully set forth here.

65.)     Plaintiff is an individual with a disability, having a record of physical impairment, and is known to defendant as having a permanent physical impairment, specifically, Lyme disease and co-infections.

66.)     Plaintiff's disability substantially limits one or more major life activities and/or major bodily functions in the following ways, among others:  causing damage to her central nervous system; brain lesions; digestive tract dysfunction; radiating pain in the nervous system; chronic joint and muscle pain, weakness, profound fatigue and sleep disturbances; nausea; degeneration of the lumbar spine and discs; fine motor skill impairment; difficulty with balance; liver and spleen infection and enlargement; and cognitive dysfunction.

67.)     Plaintiff is a qualified individual with a disability because, with or without reasonable accommodation, she is able to perform the essential functions of an attorney in HCE and elsewhere in the Civil Rights Division.

68.)     At all times following her diagnosis in 2009, defendant knew that Plaintiff suffered from the impairment of Lyme disease, its effects, and the medical protocols she underwent to treat it.

69.)     No later than October of 2015, defendant knew that Plaintiff was disabled by Lyme disease and that she was a qualified individual with a disability.

70.)     In early October of 2015, Plaintiff contacted defendant's disability coordinator in order to initiate the formal reasonable accommodation process.

71.)     On October 30, 2015, Plaintiff provided defendant with a written formal request for reasonable accommodation, seeking reassignment to an attorney position in the Civil Rights Division with fewer court-imposed deadlines, more manageable hours, fewer or assistance with physical tasks, and adequate filing systems and support staff.

72.)     Plaintiff's request was supported by a comprehensive medical report from her treating physician, Joseph Jemsek, M.D., which detailed Plaintiff's disability, its etiology, its effect on her, and its chronicity; Plaintiff's treatment program and its potential to exacerbate her symptoms on its own; and the deleterious impact that physical, psychological, and environmental stressors have on her disability.  Dr. Jemsek's report specifically supported Plaintiff's request for an RA in the form of a reassignment stating that such a reassignment would be "highly medically beneficial" for Plaintiff.

73.)     On November 4, 2015, defendant revoked Plaintiff's telework and AWS on the basis of an alleged policy that applied to attorneys who were not disabled when it issued her a baseless PIP and a Reprimand.

74.)     On November 6, 2015, defendant informed Plaintiff that her RA request was complete, although subsequently, on November 19, 2015, defendant indicated that her request was deficient because Dr. Jemsek's report did not state that a reassignment was "medically necessary." Defendant also gave Plaintiff an arbitrary cutoff date of December 18, 2015 to supplement Dr. Jemsek's report, at which point her RA request would be and was closed out, thereby delaying and

defeating the interactive process and granting her a reasonable accommodation. As Plaintiff informed defendant, she was unable to meet that deadline due to the demands of Dr. Jemsek's practice.

75.)    On November 30, 2015, Plaintiff submitted a supplement to her RA request, which contained a detailed explanation demonstrating that she was excluded from teleworking and AWS improperly, and that she relied on both for managing and accommodating her illness.

76.)    On December 18, 2015, defendant denied Plaintiff's RA request for reassignment on the ground that she failed to demonstrate that a reassignment was "medically necessary." Defendant did so without engaging in the interactive process, offering interim or effective alternate accommodations, or reinstating Plaintiff's AWS or telework.

77.)    In the foregoing ways, individually and together, beginning in October of 2015 and continuing through February 23, 2016, defendant violated the Americans With Disabilities Act as amended, 42 U.S.C. §12112, et seq., by failing to engage in the interactive accommodation process in good faith; delaying the interactive accommodation process; failing to accord Plaintiff a reasonable accommodation in a timely manner; denying and closing out Plaintiff's reasonable accommodation request for a reassignment on December 18, 2015, on the baseless ground that her request did not demonstrate that a reassignment was "medically necessary"; failing to offer Plaintiff alternative and/or interim accommodations, both before and after closing out her RA request, that would allow plaintiff to fully enjoy the benefits and privileges of her employment were she not disabled; and revoking and failing to reinstate Plaintiff's ability to telework and work on an Alternative Work Schedule ("AWS").

78.)    Defendant's violation of Plaintiff's civil rights exacerbated Plaintiff's Lyme Disease and symptoms, in particular, nerve pain and other symptoms related to central nervous

system damage caused by the disease, digestive tract problems, and marked fatigue, and has triggered additional auto-immune manifestations of her illness, for example, chronic urticaria and angioedema.  Defendant's actions have also caused Plaintiff to suffer physical and emotional pain, embarrassment, humiliation, mental anguish, inconvenience, career loss, loss of future career opportunities, loss of professional reputation, and loss of enjoyment of life.

**COUNT II**
**(<u>Violations of the ADA:  February 24, 2016 through May 24, 2016</u>)**

79.)    Plaintiff repeats the allegations contained in paragraphs 1 through 78 above, as though fully set forth here.

80.)    Plaintiff is an individual with a disability, having a record of physical impairment, and is regarded by defendant as having a permanent physical impairment, specifically, Lyme disease and co-infections.

81.)    Plaintiff's disability substantially limits one or more major life activities and/or major bodily functions in the following ways, among others:  causing damage to her central nervous system; brain lesions; digestive tract dysfunction; radiating pain in the nervous system; chronic joint and muscle pain, weakness, and fatigue; nausea; degeneration of the lumbar spine and discs; difficulty with balance; liver and spleen infection and enlargement; and cognitive dysfunction.

82.)    Plaintiff is a qualified individual with a disability because, with or without reasonable accommodation, she is able to perform the essential functions of an attorney in HCE and elsewhere in the Civil Rights Division.

83.)    At all times following her diagnosis in 2009, defendant knew that Plaintiff suffered from Lyme disease and of the effects of the medical protocols she underwent to treat it.

84.)    No later than October of 2015, defendant knew that Plaintiff was disabled by Lyme disease and that she was a qualified individual with a disability.

85.)    On February 24, 2016, Plaintiff submitted a renewed written formal RA request that defendant reasonably accommodate her disability by reassigning her to an attorney position in the Civil Rights Division with fewer court-imposed deadlines, more manageable hours, and adequate filing systems and support staff.  Plaintiff's renewed request was accompanied by a revised report by her physician, Dr. Jemsek, which once again fully supported Ms. Langworthy's request for a transfer.  It again detailed her impairment and symptoms, as well as the significant and detrimental impact that external stressors had on her condition.  This report expressed Dr. Jemsek's expert medical opinion that a reassignment to a section with fewer court deadlines, more regular and predictable hours, more available teamwork, and an environment in which supervisors understood and would assist in mitigating the deleterious effects of stress on Ms. Langworthy's condition was "medically necessary."

86.)    Between February 24, 2016 and May 24, 2016, defendant did not meet with Plaintiff to discuss her RA request; grant her request for reassignment or offer her interim and/or alternative accommodations that would allow plaintiff to fully enjoy the benefits and privileges of her employment were she not disabled; or restore her telework and AWS.

87.)    In the foregoing ways, individually and together, beginning on February 24, 2016 and continuing through May 24, 2016, defendant violated the Americans With Disabilities Act as amended, 42 U.S.C. §12112, et seq., by failing to engage in the interactive accommodation process in good faith; delaying the interactive accommodation process; failing to accord Plaintiff a reasonable accommodation in a timely manner; failing to grant Plaintiff her RA request for

reassignment; failing to offer Plaintiff alternative and/or interim accommodations; and failing to reinstate Plaintiff's ability to telework.

88.)     Defendant's violation of Plaintiff's civil rights exacerbated Plaintiff's Lyme disease, in particular nerve pain and other symptoms related to central nervous system damage caused by the disease, digestive tract problems, and marked fatigue, and triggered additional auto-immune manifestations of her chronic illness, for example, urticaria and angioedema.  Defendant's actions also caused Plaintiff to suffer physical and emotional pain, embarrassment, humiliation, mental anguish, inconvenience, career loss, loss of future career opportunities, loss of professional reputation, and loss of enjoyment of life.

## COUNT III
### (Violations of the ADA:  May 25, 2016 through the Present)

89.)     Plaintiff repeats the allegations contained in paragraphs 1 through 88 above, as though fully set forth here.

90.)     Plaintiff is an individual with a disability, having a record of physical impairment, and is regarded by defendant as having a permanent physical impairment, specifically, Lyme Disease and co-infections.

91.)     Plaintiff's disability substantially limits one or more major life activities and/or major bodily functions in the following ways, among others: causing damage to her central nervous system; brain lesions; digestive tract dysfunction; radiating pain in the nervous system; chronic pain, weakness, and fatigue; nausea; degeneration of the lumbar spine and discs; difficulty with balance; liver and spleen infection and enlargement; and cognitive dysfunction.

92.)     Plaintiff is a qualified individual with a disability because, with or without reasonable accommodation, she is able to perform the essential functions of an attorney in HCE and elsewhere in the Civil Rights Division.

93.)    At all times following her diagnosis in 2009, defendant knew that Plaintiff suffered from Lyme Disease and of the effects of the medical protocols she underwent to treat it.

94.)    No later than October of 2015, defendant knew that Plaintiff was disabled by Lyme Disease and that she was a qualified individual with a disability.

95.)    On May 25, 2016, seven months after Plaintiff's initial RA request and three months after her supplemental RA request, defendant engaged in the interactive RA process for the first time by holding a meeting between Ms. Langworthy, its deciding official, its disability coordinator, and an HCE manager to discuss her request for accommodation.  This was the first time that Defendant considered the substance of Plaintiff's RA request rather than summarily rejecting or ignoring it.

96.)    On June 10, 2016, defendant denied Plaintiff's RA request for reassignment.  At this time, defendant failed to provide any effective alternate and/or interim accommodations in its place.  On July 19, 2016, defendant denied Plaintiff's request for reconsideration.

97.)    On July 28, 2016, nearly nine months after Plaintiff's initial RA request and five months after her supplemental RA request, defendant met with Plaintiff to discuss "alternate" accommodations for the first time.  In place of reassignment, defendant suggested reinstating Ms. Langworthy's telework; offering IT assistance to help enable to her to work from home; agreeing in the short-term to avoid giving Ms. Langworthy one type of assignment with particularly tight turn-around times, HUD "election referrals"; and offering Ms. Langworthy assistance in moving boxes in the future.  This minimal offer of all-but ineffectual alternate accommodations was subsequently put into writing on August 1, 2016, and Ms. Langworthy's telework was restored on August 22, 2016, after new paperwork was submitted and approved.

98.)     In the foregoing ways, individually and together, beginning on May 25, 2016 and continuing through the present, defendant violated the Americans With Disabilities Act, 42 U.S.C. §12112, et seq., by failing to engage in the interactive accommodation process in good faith; delaying the interactive accommodation process; failing to accord Plaintiff a reasonable accommodation in a timely manner; failing to grant Plaintiff her RA request for reassignment; and failing to timely offer Plaintiff effective alternative and/or interim accommodations that would allow Plaintiff to fully enjoy the benefits and privileges of her employment were she not disabled.

99.)     Defendant's violation of Plaintiff's civil rights exacerbated Plaintiff's Lyme disease, in particular nerve pain and other symptoms related to central nervous system damage caused by the disease, digestive tract problems, and exhaustion, and triggered additional auto-immune manifestations of her chronic illness, for example, chronic urticaria and angioedema. Defendant's actions also caused Plaintiff to suffer physical and emotional pain, embarrassment, humiliation, mental anguish, inconvenience, career loss, loss of future career opportunities, loss of professional reputation, and loss of enjoyment of life.

### COUNT IV
### (Violations of the ADA:  October 2015 through the Present)

100.)   Plaintiff repeats the allegations contained in paragraphs 1 through 99 above, as though fully set forth here.

101.)   For the reasons specified in Counts I, II, and III, paragraphs 68 through 100, above, individually and together, beginning in October of 2015 and continuing through the present, defendant violated the Americans With Disabilities Act, 42 U.S.C. §12112, et seq., by failing to engage in the interactive accommodation process in good faith; delaying the interactive accommodation process; failing to accord Plaintiff a reasonable accommodation in a timely manner; denying and closing out Plaintiff's reasonable accommodation request for a reassignment

on December 18, 2015 on the baseless ground that her request did not demonstrate that a reassignment was "medically necessary;" failing to timely offer Plaintiff effective alternative interim accommodations; revoking and failing to reinstate Plaintiff's ability to telework and work on an Alternative Work Schedule ("AWS") in a timely fashion; failing to grant Plaintiff her RA request for reassignment; and failing to offer Plaintiff effective alternative accommodations on a permanent basis that would allow plaintiff to fully enjoy the benefits and privileges of her employment were she not disabled.

102.)   Defendant's violation of Plaintiff's civil rights exacerbated Plaintiff's Lyme disease, in particular, nerve pain and other symptoms related to central nervous system damage caused by the disease, digestive tract problems, and exhaustion, and triggered additional auto-immune manifestations of her chronic illness, for example, urticaria and angioedema.  Defendant's actions also caused Plaintiff to suffer physical and emotional pain, embarrassment, humiliation, mental anguish, inconvenience, career loss, loss of future career opportunities, loss of professional reputation, and loss of enjoyment of life.

## COUNT V
### (Violations of the ADA:  Retaliation)

103.)   Plaintiff repeats the allegations contained in paragraphs 1 through 102 above, as though fully set forth here.

104.)   Beginning in October of 2015, at all times relevant to this action, Plaintiff engaged in protected ADA activity including, among others, the following:  initiating the RA process in early October of 2015; submitting a formal written RA request on October 30, 2015; submitting a supplement to her RA request on November 30, 2015; repeatedly trying to have her telework and, until it was no longer effective, her AWS restored; initiating the administrative EEO/ADA complaints process on December 3, 2015, and continuing to engage in that process; submitting a

formal written renewed RA request on February 24, 2016; filing a formal administrative EEO/ADA complaint on March 16, 2016; filing a request for reconsideration of defendant's denial of her RA request on June 17, 2016; and repeatedly attempting to engage defendant in the interactive accommodation process beginning in October of 2015.

105.)    Beginning no later than November 4, 2015, defendant retaliated against Plaintiff on account of her protected ADA activities in one or more of the following ways:  issuing a baseless Performance Improvement Plan ("PIP") and a formal Reprimand which defendant then used as grounds for revoking Plaintiff's telework and AWS; failing to restore Plaintiff's AWS until it was no longer effective and failing to restore plaintiff's telework for nearly ten months; failing to engage in the interactive accommodation process in good faith and in a timely manner; denying Plaintiff the RA she sought in the form of a permanent reassignment to an attorney position with fewer court-imposed deadlines, more consistent and manageable hours, fewer physical requirements, and adequate support staff in place; failing to offer Plaintiff effective alternative interim accommodations while it was considering her request for RA; and failing to offer Plaintiff effective alternative accommodations that would allow plaintiff to fully enjoy the benefits and privileges of her employment were she not disabled; simultaneously issuing Plaintiff a Performance Improvement Plan ("PIP") and a formal Reprimand, without adequate notice and based substantially on false allegations about which she was not previously informed nor provided an opportunity to respond, and using the PIP and Reprimand as the basis for revoking her telework and AWS based on a policy that applied to attorneys who were not disabled; failing to restore Plaintiff's telework and AWS for nearly ten months; failing to engage in and delaying the interactive accommodation process in good faith; failing to offer Plaintiff interim accommodations

in the form of telework, AWS, and/or reassignment; and failing to timely offer Plaintiff effective alternative accommodations.

106.)   In taking the foregoing actions, Defendant took materially adverse actions against Plaintiff that would dissuade a reasonable employee from exercising her rights under the Americans With Disabilities Act, 42 U.S.C. §12112, et seq.

107.)   Defendant violated the Americans With Disabilities Act, 42 U.S.C. §12203(a), by retaliating against Plaintiff in taking the foregoing materially adverse actions.

108.)   Defendant's violation of Plaintiff's civil rights exacerbated Plaintiff's Lyme disease, in particular, nerve pain and other symptoms related to central nervous system damage caused by the disease, digestive tract problems, and marked fatigue, and triggered additional auto-immune manifestations of her chronic illness, for example, urticaria and angioedema.  Defendant's actions also caused Plaintiff to suffer physical and emotional pain, embarrassment, humiliation, mental anguish, inconvenience, career loss, loss of future career opportunities, loss of professional reputation, and loss of enjoyment of life.

## PRAYER FOR RELIEF

Wherefore, Plaintiff Nancy F. Langworthy respectfully requests that the Court enter judgment in her favor and award her the following relief:

A.   An Order declaring that defendant violated Plaintiff's civil rights under the Americans With Disabilities Act, 42 U.S.C. §12112, et seq., as amended by the ADA Amendments Act of 2008 ("ADAAA"), Public Law No. 110-325, and the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§791, et seq.

B.  An order reassigning Plaintiff to an attorney position in the Department of Justice at the same grade with fewer court-imposed deadlines, more consistent and manageable hours, more reliable support, and available teleworking;

C.  Record correction removing the Performance Improvement Plan and Reprimand issued to Plaintiff on November 4, 2015, from her official personnel files and prohibiting its use for progressive discipline;

D.  Other suitable equitable relief;

E.  Compensatory damages in an amount to be determined at trial to compensate Plaintiff for the physical and emotional pain, embarrassment, humiliation, mental anguish, inconvenience, career loss, loss of future career opportunities, loss of professional reputation, deterioration of health, and loss of enjoyment of life caused by defendant's actions;

F.  An award of Plaintiff's attorneys' fees and costs; and

G.  Such other relief as may be just and appropriate.

## Jury Demand

Plaintiff requests a trial by jury of all issues so triable.

Respectfully submitted,

Robert C. Seldon, Esq.
D.C. Bar No. 245100

Charlene Bofinger, Esq.
D.C. Bar No. 368879

Molly E. Buie, Esq.
D.C. Bar No. 483767
Seldon Bofinger & Associates, P.C.
1319 F Street, N.W., Suite 200
Washington, D.C.  20004
(202) 393-8200
Counsel for Plaintiff